Ollie GREEN, Plaintiff,

v.

NEW YORK & CUBA MAIL STEAM-
SHIP COMPANY and the United States
Lines Company, Defendants.

United States District Court
S. D. New York.

Oct. 2, 1962.

Silas B. Axtell, New York City, for plaintiff, Charles A. Ellis, New York City, of counsel.

Dougherty, Ryan & Mahoney, New York City, for defendants, Robert J. Giuffra, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiff Green sues for damages for personal injuries sustained on December 21, 1953 when he was assaulted and badly beaten by three members of the crew of the S.S. Virginia City Victory, on which he was then serving as purser. Defendants New York & Cuba Mail Steamship Company (N. Y. & Cuba Mail) and the United States Lines Company, (U. S. Lines) were operating the Virginia City Victory at the time of the assault as general agent and sub-agent, respectively, for the owner, the United States, pursuant to a Service Agreement, Contract No. MA–127–GAA, entered into by N. Y. & Cuba Mail and the United States on May 28, 1951.

Plaintiff bases his claim for relief here on two theories. He contends, first, that his injuries were caused by the affirmative negligence of defendants because they brought about the reemployment of his principal assailant, second assistant engineer Kampe, during the Virginia City Victory's voyage with knowledge of his dangerous propensities

and against the advice and wishes of the Master of the vessel. Secondly, he contends that the Virginia City Victory was unseaworthy because of the presence of Kampe as a member of the ship's company, and that defendants are liable for the consequences of such unseaworthiness.

Defendants deny any negligence and assert (1) that they acted throughout within the scope of their agency agreement with the United States, and (2) that in any event plaintiff's exclusive remedy is against the United States under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq.

Jurisdiction is based on diversity of citizenship. (28 U.S.C. § 1332.) The court has jurisdiction of the parties and subject matter.

The case was tried before me without a jury. Plaintiff testified on his own behalf. The master of the vessel, Captain Haley, also called by plaintiff, was the only other witness, no witnesses having been called by the defendants.

The relevant facts as I find them to be are as follows:

On May 28, 1951, the United States and defendant N. Y. & Cuba Mail entered into an agreement by which the United States appointed N. Y. & Cuba Mail its general agent, to manage and conduct the business of vessels assigned to N. Y. & Cuba Mail by the United States and accepted by the company. The agreement specifically provided that N. Y. & Cuba Mail was not an independent contractor for the vessels so to be assigned. It was to be paid for its services at a reasonable rate fixed by the United States by General Order.

The contract, Service Agreement, Contract No. MA–127–GAA gave N. Y. & Cuba Mail the authority to select sub-agents but bound it to terminate any sub-agency agreement if the United States so directed. The agreement also provided that N. Y. & Cuba Mail was to procure the master for each of the vessels to be operated under the agreement, whose engagement was to be subject to the approval of the United States. The master was to be the agent and employee of the United States and he was to "have and exercise full control, responsibility and authority with respect to the manning, navigation and management of the vessel." The officers and crew of each vessel were also to be in 'the employ of the United States.

On April 2, 1953 the Government, acting through the National Shipping Authority of the Maritime Administration, Department of Commerce, delivered the Virginia City Victory to N. Y. & Cuba Mail, and the company accepted the vessel. U. S. Lines was appointed sub-agent for the vessel by N. Y. & Cuba Mail and in May of 1953 Captain Haley was procured by the defendants and approved by the United States as Master of the vessel.

Pursuant to the provision of the agreement that the agent was to "procure and make available to the master for engagement by him the officers and men required by him to fill the complement of the vessel", plaintiff Green and his assailants, Kampe, Chamberlin and Kauder were procured and made available to Captain Haley by the defendants for engagement as officers to fill the required complement of the Virginia City Victory. All four men were engaged by the master, Green signed on as purser and Kampe as second assistant engineer.

The Virginia City Victory commenced her outbound voyage to the Orient on August 11, 1953. Although she had been issued a certificate of seaworthiness in the United States, she was apparently in poor mechanical condition and a series of breakdowns kept the officers and crew of the engineering department working overtime under emergency conditions. At least partly as the result of these conditions numerous fights and quarrels developed among the crew.

On October 29, 1953, while the vessel was en route from Haiphong, French Indo-China to Manila, Philippine Islands, second assistant engineer Kampe had a quarrel with chief engineer Goodsell

whom he punched and knocked out. The incident was reported in the ship's log, and on November 3 Captain Haley wrote the General Superintendent of N. Y. & Cuba Mail in New York that " * * * it appears now, the 2nd Assistant will have to be paid off to bring some kind of peace to the ship."

On November 4, 1953 the United States Embassy in Manila received a cable from Saigon stating that members of the crew of the Virginia City Victory wished to register complaints against the master. The trouble in the engine room was reported in this telegram as well.

The Virginia City Victory arrived in Manila on November 5. Captain Haley and the plaintiff reported to the office of the U. S. Lines there and saw the manager. They received advance payments for the crew and were told that no replacement was available for 1st assistant engineer Perry who had been a source of trouble during the voyage and who had apparently manifested a desire to sign off the ship's Articles. The complaints against Kampe were also mentioned but the log entries on this subject were not shown to the manager. The master and Green were referred to the American Consulate with these complaints.

A hearing was held before the United States Consul concerning these complaints. The Consul's report on the hearing indicates that the primary causes for the friction aboard ship were the mechanical difficulties of the vessel and the failure of the master to properly exercise his authority over the crew. Considerable attention was given by the Consul to the serious ill feeling between Perry and the rest of the engineering department as well. According to the report Captain Haley expressed the view "that if Perry stays aboard the ship there is no guarantee that there will not be any trouble aboard." It was decided that Perry sign off the Articles by mutual consent and he agreed to pay for his own repatriation.

This report of the proceedings, it must be noted, is in conflict with the implica-tions in the testimony of both the plaintiff and Captain Haley that Perry himself asked to sign off because he was afraid to remain aboard ship with Kampe. To the extent that such conflict exists I find that the Consul's report is the more accurate statement of the situation.

Complaints by members of the crew against the captain and the purser were also aired at this hearing. They were addressed primarily to failure to make shore liberty, boats and draws available at two other ports at which the vessel had touched. Neither the master nor Green were willing to take measures to alleviate tension aboard suggested to them privately by the Consul.

With reference to the Kampe matter, the Consul's report indicates that Kampe, Haley and the chief engineer appeared before him and

"all stated that any past quarrels had been settled and there would be no future difficulties. * * * Nothing more was heard of the case of Mr. Kampe over the intervening week end until six hours before the SS Virginia City Victory left Manila. At that time, the Captain and Chief Engineer reappeared with a series of five statements against Mr. Kampe * * *. They indicated that they merely wished to file these statements with the Embassy and suggested no further action."

In the interim Green and Kampe became involved in an altercation in a local bar. Green testified on the trial that Kampe started the fight by cursing, spitting in his face, and hitting him. In return, Green said he swung at his assailant with a beer stein. He hit him sufficiently hard to give Kampe a mild cerebral concussion.

The Virginia City Victory sailed from Manila on November 9, 1953. Kampe, who had left the vessel with the master's consent shortly before sailing time, failed to report to duty when she sailed. There is some question as to whether he intentionally missed ship or was detained in

the hospital for treatment of the concussion he had suffered in his altercation with Green. His personal effects were left aboard ship, however, and a letter from a Dr. Hendricks of the Santa Isabel Hospital in Manila to "Whom It May Concern" indicates that he was not discharged from the hospital, for medical reasons, until after the Virginia City Victory had sailed. There is some question as well as to whether the sailing time had been posted when Kampe went ashore and whether Kampe was under the mistaken impression that the Virginia City Victory was not sailing until the 10th. Kampe, in any event, was discharged by the hospital on November 10 in the care of U. S. Lines office in Manila.

Before the Virginia City Victory embarked from Manila Captain Haley asked the U. S. Lines agent there to wire ahead to Yokohama, Japan, for a replacement for first assistant engineer Perry. With the Virginia City Victory now at sea without either a first or second assistant engineer, because Kampe had missed the ship, a series of telegrams were exchanged between the U. S. Lines offices in Manila and Yokohama. Manila cabled on November 9 that the vessel would be arriving in Yokohama in a few days and needed a first assistant engineer. Two days later the Yokohama office cabled back inquiring whether "imperative secure first assistant". Manila responded:

"Do not believe imperative stop 2nd asst failed join Manila we endeavoring arrange fly yours rejoin advising stop * * *."

Meanwhile Kampe had appeared at the United States Embassy in Manila on November 10, explained why he had missed ship, and asked that he be signed off Articles and returned to the United States. The Consul explained to him that because of the background of the case there might be some question as to whether he intentionally missed his ship. Kampe thereupon determined to rejoin the Virginia City Victory at Yokohama, and U. S. Lines proceeded to make the necessary arrangements for his transportation there.

In the interim Captain Haley had certified as to Kampe's removal from the Virginia City Victory's Articles before the American Consul at Naha, Okinawa.

The Virginia City Victory arrived in Yokohama on November 18, 1953. Kampe met the ship and boarded her with a messenger from the offices of U. S. Lines. He reported for duty to Captain Haley but the master refused to take him back. The U. S. Lines messenger then advised the master that the Coast Guard wanted to see him with regard to Kampe so that the matter could be straightened out.

Captain Haley proceeded to the U. S. Lines office where he informed the agent that Kampe was a troublemaker and that he did not want him back aboard ship. The agent told him the entire matter had to be taken up with the Coast Guard. A letter from U. S. Lines' Yokohama office to Captain Haley dated November 19, 1953 reflects the position taken by the Lines at that point. It reads, in part:

"* * * it is the opinion of this company as the local agent for your vessel, together with the U. S. Coast Guard and the American Consulate, that in order to properly effect Kampe's separation from the Articles of your vessel after he has made the attempt in rejoining at his own expense, that you should present your case substantiated by Log Book entries and a petition signed by those crewmembers who are objecting to his return to assume his previous position as 2nd Asst. Engineer, so that proper charges can be investigated and a hearing conducted. If the evidence is sufficient to warrant Kampe's separation, then the U. S. Coast Guard, Merchant Marine Detail at this port will make the necessary recommendation to the American Consulate in order that a release can be secured for the seaman by his separation on a misconduct basis. However, as the case now stands, it is required that this engineer be reinstated aboard your command. We regret that there is no alternative

but to approach this matter as per usual practice in a foreign port."

The National Shipping Authorities Far Eastern Area Office was apparently of the same view. On November 20, 1953 it wrote U. S. Lines:

"Our opinion of the matter, which has been verbally confirmed in principle by Mr. Rocke, Vice Consul, Yokohama, and Cdr Elliot, U.S.C.G. Yokohama, is that the master cannot lawfully refuse to accept the man back on board as the position has not been filled and to refuse to do so and depart from Yokohama without him would, in all probability constitute abandonment of a seaman in a foreign port. If the master feels that he has sufficient grounds for separation for cause then he must substantiate his allegations to the satisfaction of the American Consul. If this were done, we are certain that the Consul would take appropriate action and remove the man in a lawful manner. As this, to date, has not been done, the master must accept the man back on board."

Captain Haley subsequently reported to the Coast Guard office and as a result of his discussions there with Commander Elliot a hearing was held before the Coast Guard on the charges against Kampe. As part of the investigation Kampe underwent medical and physical examinations at the Army Hospital. Although the psychiatric report had some serious reservations about the man, the hospital found Kampe in all respects fit for duty.

The report of the Coast Guard hearing on the charges against Kampe was not written up until December 14, 1953, which was well after the Virginia City Victory left Yokohama. However, Captain Haley testified that Commander Elliot directed him orally to take Kampe back aboard ship for the return voyage to the United States. He was advised that if Kampe caused any further trouble, he could be put in irons.

The Consul informed Captain Haley that this determination by the Coast Guard was final and an appropriate entry to that effect was made on the ship's Articles. The master testified at the trial that he took Kampe back because he was directed to do so by the Coast Guard and for no other reason.

The Virginia City sailed from Yokohama on November 26, 1953. She arrived in Mobile, Alabama, on December 20, apparently without serious incident. Two days out of port, however, Kampe warned Green that he would be doing no more sailing. Apparently nothing more was said.

On the 20th, after the Virginia City Victory docked, Green went ashore for dinner with Captain Haley. They returned to the ship by 9:00 p. m. and Green went to work on the payroll. He took a short break for coffee at the officers' mess, and then returned to his quarters. He heard loud noises coming from the engineers' section and shortly thereafter, at about 1:00 a. m. on the morning of the 21st, Kampe entered Green's quarters cursing. Kampe began to pummel Green, left, returned with Chamberlin and continued the attack. Green took a bad beating, with resulting cracked ribs and severe cuts and bruises about his head and body. After his assailants left for the second time, Green got a pistol to protect himself from further assault. However, the police arrived shortly thereafter and took both the assailants and their victim off to jail.

On these facts plaintiff seeks to recover against defendants N. Y. & Cuba Mail and the U. S. Lines for unseaworthiness and/or negligence.[1] His contention as to unseaworthiness can be quickly disposed of at the outset.

1. It may be noted that the plaintiff failed to institute suit against the Government within the two year period of limitation prescribed by the Suits in Admiralty Act (46 U.S.C. § 745). Any action he might have had against the Government is therefore time barred.

## I.

Green contends that the Virginia City Victory was unseaworthy because (A) Kampe, a man of dangerous disposition, was aboard ship as a crew member, and (B) the authority of the master was seriously undermined by Kampe's reemployment. He contends that defendants were responsible for these conditions and can therefore be held liable for them.

However, plaintiff ignores the fact that the Virginia City Victory was owned by the United States at the time of the assault. A claim for unseaworthiness would therefore plainly have lain against the Government on these very same grounds under § 2 of the Suits In Admiralty Act of 1920. (46 U.S.C. § 742.) That Act, moreover, provides that "where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States * * * whose act or omission gave rise to the claim * * *." (46 U.S.C. § 745.) The Suits In Admiralty Act having provided an exclusive remedy for a claim of this nature, plaintiff's unseaworthiness claim must fall. See Hanlon v. Waterman Steamship Corporation, 265 F.2d 206 (2 Cir. 1959) cert. den. 361 U.S. 822, 80 S.Ct. 69, 4 L.Ed.2d 67 (1959); Williams v. United States, 228 F.2d 129 (4 Cir. 1955) cert. den. 351 U.S. 986, 76 S.Ct. 1054, 100 L.Ed. 1499 (1956); Atlantic Coast Line R. Co. v. Agwilines, Inc., 195 F.2d 459 (5 Cir. 1952).

## II.

The second theory on which plaintiff seeks relief is based on the assumption that the facts establish that the defendants acted outside of the scope of their authority in connection with Kampe's rejoinder of the vessel as second assistant engineer and that they are therefore liable for their own negligence independently of any claim which might have been asserted against the Government under the Suits In Admiralty Act. This assumption is not supported by the facts and is unwarranted.

Kampe missed his ship in Manila becase he was being treated in a hospital for the concussion he sustained the day before. The report of the United States Consul in Manila indicates after Kampe's release from hospital he was urged to rejoin his ship by the Consul himself and not by the ship's agents.

The main source of difficulty while the Virginia City Victory was in Manila was Perry. No attempt was made to have Kampe signed off the Articles at that port. Under these circumstances the fact that the Manila office of the U. S. Lines made arrangements for Kampe's transportation to Yokohama can hardly be viewed as unreasonable or negligent.

Moreover, that step was entirely in keeping with the agent's obligation under its agreement with the United States to make available to the master for engagement by him such officers as were necessary to fill the ship's complement. The fact that the defendants did not provide a first assistant engineer as well as a second is irrelevant here since the contract under which defendants were operating specifically absolves them from any responsibility for failure to provide an officer.

With reference to the events that transpired in Yokohama, it is quite clear that the moving force behind Kampe's rejoining the ship at that port was the United States Coast Guard, and not defendants. Captain Haley specifically testified here that he took Kampe back aboard only because Commander Elliot told him he had to do so. There is no indication whatsoever of any threats or pressure by defendants upon Captain Haley. Moreover, there is nothing in the record to indicate that defendants' position in Yokohama was anything other than neutral. Apparently all the agents desired was that the controversy be settled between the appropriate parties—the master, the Consul and the Coast Guard.

I therefore find that defendants N. Y. & Cuba Mail and the U. S. Lines did not in any way act beyond the scope of their authority under the agency

agreement with the United States. Accordingly plaintiff's exclusive remedy is against the United States under the Suits In Admiralty Act. I may also add that I find that plaintiff has failed to establish that defendants were negligent in any respect or that their negligence was a proximate cause of the assault and the resulting injuries.

The defendants are entitled to judgment and judgment will be entered accordingly.

The foregoing constitutes my findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

It is so ordered.